**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 18-CR-310 (BAR)** |
| | : | |
| v. | : | |
| | : | |
| **KENIEL AEON THOMAS,** | : | |
| also known as **DAVID MORGAN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. Based on the arguments set forth below, and those that may be made at the sentencing hearing, the government respectfully requests that the Court sentence the defendant to a period of imprisonment at the top end of the applicable U.S. Sentencing Guidelines range, or 41 months of incarceration.

### I.     Factual and Procedural Background

On October 26, 2018, Defendant Keniel Aeon Thomas entered a guilty plea to one count of Interstate Communication with the Intent to Extort, in violation of 18 U.S.C. § 875(b). In pleading guilty, the defendant admitted that between July 17, 2014 and July 21, 2014, while in Jamaica, he communicated threats to injure and kill two of the victims in this case, L.W. and W.W., who were located in the District of Columbia. The defendant acknowledged that he made these threats with the intent to extort money from L.W. and W.W. and as part of a larger scheme to defraud victims by tricking them into believing they had won a lottery but were required to pay certain taxes and fees before collecting their prize.

1

Lottery frauds such as this have existed for some time, but they have become increasingly active over the last decade, with many of the perpetrators operating like Defendant Thomas out of Jamaica.[1] In these scams, the suspects target elderly and vulnerable victims and promise them substantial lottery winnings once they have paid bogus taxes or fees.[2] The suspects overcome victims' trepidations by using information learned through open source searches or illegally traded data sets to make it appear as though they know details about the victims' lives that only a legitimate lottery official would know.[3] These schemes often succeed in going undetected because the suspects instruct their victims not to discuss the lottery with their relatives and friends, warning them that sharing the news could jeopardize their ability to collect their winnings."[4] When victims balk at making payments, the scammers resort to threats of violence, and they use tricks like describing victims' homes based on information gleaned from Google Earth (a technology unfamiliar to many elderly victims) to make their threats seem more real.[5]

Defendant Thomas' scam targeting W.W. and L.W. evolved in a similar fashion. W.W., who was 90 years old at the time, was first contacted in March 2014 by Defendant Thomas'

---

[1] *See* Associated Press, *Jamaican lottery scams spread despite US crackdown*, Fox News (Apr. 17, 2012), http://www.foxnews.com/world/2012/04/17/jamaican-lottery-scams-spread-despite-us-crackdown/ (hereafter "April 2012 Associated Press article") (reporting that "[c]omplaints from American citizens about Jamaican lottery fraud soared from 1,867 in 2007 to about 30,000 last year, and most incidents go unreported out of fear or embarrassment, according to the U.S. Federal Trade Commission").

[2] *See generally* CBS News, *Inside the "Jamaican Lottery Scam": How U.S. seniors become targets*, CBS THIS MORNING (Mar. 12, 2013), http://www.cbsnews.com/news/inside-the-jamaican-lottery-scam-how-us-seniors-become-targets/.

[3] *See generally* Connie Thompson, *Foreign lottery scams turn violent*, KOMONews.com (Mar. 27, 2013), http://www.komonews.com/news/consumer/Foreign-lottery-scams-turn-violent-200163221.html.

[4] April 2012 Associated Press article.

[5] *Id.*

associates. Identifying themselves as "Mr. Stone," "Mr. Dudley," and "Mr. Reinhardt," these associates claimed to be employees of the "Mega Millions" lottery and informed W.W. that he had won a lottery prize worth millions of dollars but that he needed to pay certain taxes and fees before he could collect his winnings.[6] On June 9, 2014, the defendant entered the picture. Identifying himself as "David Morgan," the defendant called W.W. and told him that he was a manager with "Mega Millions" who could be reached at (876) 834-7417[7] and at kenielthomas@outlook.com.[8] The defendant reiterated that W.W. had won a substantial prize but that he needed to pay certain taxes and fees before collecting.

On June 10, 2014, W.W. called Defendant Thomas. This call was recorded with the assistance of the FBI.[9] On this recording, the defendant can be heard engaging in some of the same tactics described above. The defendant tells W.W. that he is stepping in to help W.W. collect his prize because he knows W.W. is an important man, and his associates are taking too long to deliver W.W.'s winnings. The defendant claims that he has conducted a background check of W.W. and knows that W.W. is, among other things, a judge who had served in the U.S. Navy. The defendant

---

[6] FBI memoranda documenting earlier contacts between W.W. and Defendant Thomas' associates are enclosed as "Attachment 1" through "Attachment 6" on the disc labeled "Government's Exhibit A," which will be provided to Chambers and defense counsel under separate cover and may be introduced as evidence at the sentencing hearing.

[7] In addition to admitting during his guilty plea colloquy that he placed this call and used phone number (876-834-7417) to make the threatening communications at issue in this case, Defendant Thomas listed this as his phone number on U.S. visa applications filed in June 2011, March 2013, September 2013, and March 2014. Defendant also listed this as one of his contact numbers in connection with a job application for Celebrity Cruises that he submitted in 2014. However, when he went for an interview at the U.S. embassy in September 2014, he denied that he used this number or the email address kenielthomas@outlook.com.

[8] This call was not recorded, but W.W. called the FBI Special Agent investigating the case shortly after the call to relay what the defendant had said. The FBI agent's memorandum documenting W.W.'s report is enclosed as "Attachment 7" on the disc labeled "Government's Exhibit A."

[9] A copy of this recorded call is enclosed as "Attachment 8" on the disc labeled "Government's Exhibit A."

also mentions that he has spoken to W.W.'s wife (L.W.), and that she claims to be in charge of W.W.'s accounts, and he tells W.W. he should not let his wife control his money. Finally, the defendant is persistent in trying to get W.W. to commit to sending him some amount of money. The defendant first tells W.W. that he must send $50,000 to cover the taxes on the prizes, but when W.W. explains that he does not have that type of money readily available, the defendant tells W.W. that he can start with a partial payment of $20,000, although he encourages him to send the money right away.

Over the course of the next month, the defendant placed numerous additional calls, followed up by over twenty emails, to W.W., in an attempt to arrange for W.W. to send him money.[10] When these efforts failed, the defendant escalated his tactics to threats of violence. On July 17, 2014, the defendant called W.W.'s home phone number and reached W.W.'s wife. The defendant did not identify himself and the number was blocked, but telephone records show that the phone call was from phone number (876) 834-7417. During the call, L.W. used her mobile phone to contact the FBI special agent who had been investigating the case. L.W. allowed the agent to listen to her call for approximately four minutes.[11] During the call, the agent overheard the defendant threaten L.W. by stating that she needed to pay $6,000 or the defendant would get a sniper to kill her and W.W. The defendant said that he would put a bullet "straight to the head" and burn down L.W.'s house. The defendant also told L.W. that he knew personal identifying information of W.W., including his professional background and employment history and that

---

[10] A document showing the number of email contacts between the defendant and his associates and W.W. is enclosed as "Attachment 9" on the disc labeled "Government's Exhibit A."

[11] The FBI agent's memorandum documenting what he heard on the call is enclosed as "Attachment 10" on the disc labeled "Government's Exhibit A."

W.W. had been a judge.

After the call, L.W. explained to the FBI agent that, on the portion of the call that the agent did not overhear, the defendant claimed that he had conducted surveillance on her home the previous night and described L.W.'s house as a white brick house. The defendant also told L.W. he knew that no one was at her home the prior night. L.W. told the FBI agent that, in fact, she did live in a white brick house and no one was at her home the previous night.[12]

On July 21, 2014, at approximately 11:31 a.m., L.W. received another phone call from the defendant. This time, the call was recorded.[13] On the recording, one can hear the defendant identify himself as "David Morgan." He continues to threaten L.W. and to demand that L.W. pay him money. Specifically, the defendant says, "Listen, if we don't know where you are, remember that we know where your home is, we have your address. We have everything about you. So easy that we go set your house ablaze, how is that?" When L.W. asks, "You would really bomb my house?" the defendant responds, "Don't let because, listen, don't let because of $6,000 it cause your home to be damaged or cost you or your husband life. You can be taken care of that easy." When L.W. later told the defendant she thought he was just trying to scare her, the defendant warned her, "Hey listen, it is so easy killing you, you just take a shot and put it in your sniper, aim, and the back of the head. And the shot fire right off. The shot they call blue steel, it is take a sniper,

---

[12] On July 18, 2014, at approximately 10:29 a.m., L.W. called the FBI Agent and told him that she had just received another phone call from a person that sounded similar to the caller who contacted her the previous day. Telephone records show that this call was not made from the same telephone number, but the defendant admitted during his guilty plea that he made this call. During the call, the defendant threatened L.W. again and demanded that L.W. send money within four days or he would kill her and her husband. The defendant told L.W. that he would call her again in a few days. The FBI agent's memorandum documenting what L.W. said she heard on the call is enclosed as "Attachment 11" on the disc labeled "Government's Exhibit A."

[13] A copy of this recorded call is enclosed as "Attachment 12" on the disc labeled "Government's Exhibit A."

y

find somewhere and you spy. Aim for the back of the head. You just pull the trigger; all you see blood and marrow flying out. It is easy. Do what you have to do."[14]

Fortunately, L.W. and W.W. involved law enforcement early in this scheme and did not send Defendant Thomas any money. Other victims of this scheme, however, were not as lucky. The FBI identified numerous additional victims, who sent hundreds of thousands of dollars to Defendant Thomas and his family members in connection with a lottery scheme like the one outlined above. These victims were linked by the FBI to the particular lottery scheme perpetrated by Thomas and his associates because they sent funds to Defendant Thomas and/or his family members, reported interacting with a "David Morgan," and/or they received calls from Thomas' 876-834-7417 number. The government has enclosed memoranda of interviews for four of these victims who suffered some of the most significant actual loss. The government has also enclosed an excel spreadsheet documenting payments sent by suspected victims to Defendant Thomas and his associates.[15] We will be prepared to present the testimony of the lead FBI agent on this case at the sentencing hearing, should the court have any additional questions about the scheme or evidence of defendant's involvement in it.

Many of these victims came to light because Defendant Thomas and his associates instructed W.W. to send their lottery "tax and fee payments" to these individuals. Through researching and interviewing these middlemen (or "mules"), the FBI came to learn that they were victims themselves. For example, P.W., then a 52-year-old resident of Bakersfield, California,

---

[14] The recordings of one additional recorded call with L.W., from July 22, 2014, and one additional voicemail message, left on July 23, 2014, are also enclosed as "Attachment 13" and "Attachment 14" on the disc labeled "Government's Exhibit A." In these calls, the defendant continued to threaten to harm the victims if they failed to pay him the money he demanded.

[15] See the file enclosed as "Attachment 38" on the disc labeled "Government's Exhibit A."

reported that he originally paid $250 in "fees" for his Jamaican lottery winnings but could not afford additional "fees," so he agreed to "work off" the fees by assisting the lottery company in facilitating certain financial transactions.[16]

One of the transactions that the defendant's group asked P.W. to facilitate was a $67,000 payment from W.W. (Unbeknownst to Defendant Thomas and his associates, this payment was requested after both P.W. and W.W. had agreed to assist law enforcement with this investigation.) Defendant Thomas and his associates, at various times, directed P.W. to forward this payment to multiple different individuals, including R.W. and G.J.[17] Through interviews and investigation, the FBI learned that R.W. and G.J. were additional victims of the lottery scheme, who had sent their own money to the defendant and his accomplices, and whom the suspects had also started utilizing as mules to launder the proceeds of this fraud.

At the time of the scheme, R.W. was an 82-year-old resident of Madera, California, suffering from numerous medical ailments.[18] R.W. reported to the FBI that he was lured into the scheme with a phone call: a man who called himself "Obama" phoned him repeatedly to tell him that he had won a lottery. The prize amount varied but was always in the tens of millions of dollars. Per "Obama's" instructions, R.W. sent payments to a "Keniel Thomas," who lives in Jamaica, in order to receive his prize money. R.W. estimated that he sent between $600,000 and $700,000 over the course of one year. The FBI was able to track about $70,000 in Western Union and

---

[16] FBI agent memoranda documenting information provided by P.W. are enclosed as "Attachment 15" through "Attachment 23" on the disc labeled "Government's Exhibit A."

[17] See the FBI memoranda enclosed as "Attachment 24" and "Attachment 25" on the disc labeled "Government's Exhibit A."

[18] FBI agent memoranda documenting information provided by R.W. are enclosed as "Attachment 26" and "Attachment 27" on the disc labeled "Government's Exhibit A."


MoneyGram payments from R.W. to Defendant Thomas and members of the defendant's family, plus an additional $100,000 that R.W. loaded onto "Green Dot MoneyPaks"[19] at the direction of Obama (although the FBI could not trace where these "MoneyPaks" were sent).

G.J. was an 81-year-old resident of Murrieta, California, at the time of the fraud.[20] When G.J. was contacted by the FBI, he told them he was happy that someone might finally help him, because he had reported this scam to the police, but they told him they could not help. G.J. told the FBI that he started receiving the lottery scam calls around 2011. He was told over the phone that he had won a sweepstakes lottery for $5 million, and then he started receiving several letters to his home address. The letters typically included a check and information for an individual whom he was supposed to contact for instructions on what to do with the check. G.J. remembered that the first check was a $15,000 certified check that he was told to cash and then return $500 for taxes on his winnings. G.J. did as instructed. He continued this process for numerous additional checks that arrived from individuals throughout the U.S. The instructions he received were always to cash the checks and then send a portion to Jamaica. G.J. said he sent the money via Western Union, PayPal, and Green Dot cards. He was told that the money he was sending to these individuals was money to release his winnings, which would go towards the taxes, insurance, and shipping/transporting costs associated with his prizes. In all, G.J. reported that he sent approximately $85,000, and this all was paid at a loss to him, because the checks all bounced, and

---

[19] These are prepaid, reloadable debit cards that are often used in frauds to launder funds. *See* John North, *Be wary of scams using Green Dot MoneyPaks*, Dayton Dailey News (Apr. 21, 2013), https://www.mydaytondailynews.com/business/wary-scams-using-green-dot-moneypaks/gLvsq1GdymBdgSaumu6TIK/.

[20] FBI agent memoranda documenting information provided by G.J. are enclosed as "Attachment 28" through "Attachment 32" on the disc labeled "Government's Exhibit A."

the banks came after him for the money. The FBI was able to corroborate that G.J. wired over $87,000 to Jamaican bank accounts in the name of Defendant Thomas and his girlfriend Shanique Gray; sent over $5,000 in Western Union payments made out to Defendant Thomas and his family members; sent over $2,000 in MoneyGram payments made out to Defendant Thomas; and purchased over $6,000 in Green Dot MoneyPaks (although the FBI could not trace where these "MoneyPaks" were sent). G.J. told the FBI that he continued cashing the checks, even though they were bouncing, because the "lottery officials" who kept calling him made him think it was real. He reported that they even posed as bankers authenticating the deal.

Accounts like these show how vulnerable these victims were and how obvious it would have been to Defendant Thomas that he was exploiting the elderly and the infirm. But he did not just take money from these victims. He also terrorized them by making incredibly graphic threats to murder them and to burn down their homes. J.M., a resident of Sacramento, California, was about 70 years old at the time the defendant started using him as a mule to launder other victims' money.[21] J.M. was also threatened by the defendant when he did not move quickly enough to forward to the defendant payments that other victims had sent him. J.M. said that the lottery official who identified himself a "David Morgan" told J.M. he was going to burn J.M.'s house down and kill his wife. Similarly, in the July 23, 2014 voicemail message discussed in footnote 14 above, the defendant told L.W.:

> Hey. I know you are fucking playing around. Right? You know what I am going to do? I won't call you back. I am going to fucking kill you. I am going to fucking kill your husband. I am going to fucking set your house on fire. Because you seems to be playing around and you doesn't fucking know who am I. So listen. I am not giving you anymore warning. I am just going to send out my guys. And listen.

---

[21] FBI agent memoranda documenting information provided by J.M. are enclosed as "Attachment 33" through "Attachment 37" on the disc labeled "Government's Exhibit A."

> Anytime you put back yourself in Washington, D.C., you will be fucking killed. With a fucking sniper. I know your home. You see, you live at the place where your home at. You live at a very lonely place. And the moment you arrive, I'm gonna put a fucking shot in your head. I am going to burn your fucking house down. I won't – I *don't* play.

The graphic nature of these threats is one reason why the government felt strongly about Defendant Thomas pleading guilty to Interstate Communication with the Intent to Extort, in violation of 18 U.S.C. § 875(b).

## II.     Government's Sentencing Recommendation

The government recommends a sentence at the top end of the applicable Guidelines range, or 41 months of incarceration. A significant period of incarceration is necessary to adequately reflect the financial and emotional harm the defendant inflicted on numerous vulnerable victims, and to deter both this defendant and others tempted by the promise of easily gotten gains from participating in future lottery schemes.

### a.  Legal Standards

For a violation of 18 U.S.C. § 875(b), the maximum sentence that can be imposed is twenty (20) years of imprisonment, and a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3),(d). The defendant also may be subject to a three-year term of supervised release, pursuant to 18 U.S.C. §3583(b)(2), although supervised release is not required by the statute,[22] and a mandatory special assessment of $100. Finally, the defendant may be subject to applicable interest and penalties on fines and restitution not timely made.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United

---

[22] Here, because the defendant has agreed to an order of removal, the government is not requesting the imposition of a period of supervised release. See U.S. Sentencing Guidelines § 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.").

10

States Sentencing Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Gall v. United States, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)). As one member of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence." United States v. Doe, 413 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence. United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide

11

just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

### b. Analysis

At the outset, the government agrees with the Pre-Sentence Report's calculation that the applicable sentencing guidelines range, pursuant to the United States Sentencing Guidelines, *Guidelines Manual* (2018) ("Sentencing Guidelines," "Guidelines" or "U.S.S.G."), is 33-41 months of incarceration.

The defendant's Base Offense Level, for pleading guilty to one violation of 18 U.S.C. § 875(b), is 18. U.S.S.G. § 2B3.2. The Specific Offense Characteristics raise his Total Offense Level to 23. Specifically, the defendant's offense level is increased by one point because he demanded more than $20,000 from L.W. and W.W., § 2B3.2(b)(2)(B). As noted above, the defendant initially demanded $50,000 from W.W., came down to being willing to accept $20,000 and then $6,000, and then emailed W.W. that he needed to pay $30,000 given how long he had delayed in making payments.[23] The defendant's offense level is increased by two additional points because the relevant offense conduct involved a threat of death, § 2B3.2(b)(1). As described above, the defendant threatened to kill W.W. and L.W. on numerous occasions. Finally, the defendant's

---

[23] In referencing financial loss suffered by additional victims in this case, the government has meant to illustrate why the nature and circumstances of this offense justify a sentence at the top of the applicable Sentencing Guidelines range. It was the parties' agreement during plea negotiations, and it is the government's position now at sentencing, that the only loss amount relevant to determining the specific offense characteristics in this case is the amount of money demanded by the defendant in committing the crime to which he pleaded guilty.

offense level is increased another two points because the defendant targeted vulnerable victims, § 3A1.1. As mentioned above, W.W. was about 90 years old at the time of these crimes, a fact easily discernable from looking up the former public official on the Internet, which the defendant admitted to doing in the recorded calls. Moreover, despite L.W. telling him that W.W. was having health troubles and that L.W. now managed W.W.'s finances, the defendant persisted in trying to scam him. Finally, as documented above, the pattern of whom the defendant selected as the targets of this fraud reflects an intent to exploit the elderly and the infirm.

After a downward adjustment of three points for acceptance of responsibility, § 3E1.1, the defendant's Total Offense Level is 20. Defendant is in Criminal History Category I, which results in a recommended Guidelines range of 33-41 months of incarceration. Applying the sentencing factors set forth in 18 U.S.C. § 3553, it is clear that the most appropriate sentence is a period of incarceration at the high end of that range.

### 1. Nature of the Offense

As laid out in detail above, the defendant's threats against L.W. and W.W. were the clearest and most well documented example of a years-long conspiracy to trick, cajole, harass, and intimidate elderly and otherwise vulnerable victims into paying him money he had no right to collect. These threats were specific, fear-inducing, and preyed upon the vulnerabilities of the victims. Importantly, the defendant's conduct caused many victims actual financial loss. As documented in the enclosed spreadsheet, the defendant collected at least $300,000 from this scam but, based on information reported by numerous victims, the actual loss figure is likely much higher.

Another significant factor in the government's request is that the defendant also inflicted

upon all of his victims feelings of stress, anxiety, embarrassment, and self-doubt. Not only did these victims have to worry about paying the defendant and his accomplices and later trying to get that money back – but once they realized they had been duped, many of these victims were forced to reckon with the question of whether their mental faculties were sharp enough to continue living independently. Finally, in those victims whom the defendant threatened, the defendant incited terror that they, their homes, and their loved ones might be brutally destroyed.[24]

### 2. Thomas' History and Characteristics

The defendant has no known criminal history, which is accurately reflected in his low criminal history category.

### 3. The Need to Reflect the Seriousness of Thomas' Crimes, To Promote Respect for the Law, and to Provide Just Punishment for the Offense

Thomas' crimes are serious ones that targeted some of the most vulnerable members of our community. A significant sentence of incarceration is warranted under these circumstances.

### 4. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

As explained above, the type of lottery scam perpetrated by the defendant and his associates in the instant case has been on the rise in the last decade. These scams are often perpetrated, as they were here, against American citizens from foreign soil. A sentence involving a lengthy period of incarceration is necessary in this case to serve as a deterrent to the defendant and to future fraudsters looking to target elderly and infirm American victims.

### 5. Other Sentencing Factors

---

[24] As of the time of filing of this memorandum, the government has not received any victim impact statements, but several victims have indicated that they will be submitting statements. The government will file a supplemental pleading if it receives any victim impact statements before the sentencing hearing.

A sentence of 41 months of incarceration would be consistent with the other Section 3553(a) factors. Because the government's recommendation is within the Sentencing Guideline range, it is in the "heartland" of sentences imposed for this particular offense and therefore accomplishes the goal of avoiding unwarranted sentence disparities. *See* U.S.S.G. ch 1, pt. A, cmnt 4(b). This sentence would adequately address the need to protect the public from future crimes by Thomas and similarly motivated individuals.

### III.   Conclusion

WHEREFORE, the government respectfully requests that the Court sentence the defendant to 41 months of incarceration.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

By:   /s/
DAVID J. GORMAN, VA Bar. No. 31167
KATHRYN L. RAKOCZY, D.C. Bar No. 994559
Assistant United States Attorneys
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7816 (Gorman phone)
David.Gorman2@usdoj.gov
(202) 252-6928 (Rakoczy phone)
Kathryn.Rakoczy@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2018, a copy of this motion was sent via electronic case filing to counsel for the defendant.

   /s/
Kathryn L. Rakoczy
Assistant United States Attorney